**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RACHEL BARNHART,<br><br>                                      Plaintiffs,<br><br>-against-<br><br>THE CITY OF ROCHESTER, a municipal entity, "JOHN DOE POLICE OFFICERS 1-200" (names and number of whom are unknown at present), THE COUNTY OF MONROE, TODD BAXTER, "RICHARD ROE SHERIFF'S DEPUTIES 1-200" (names and number of whom are unknown at present), and other unidentified members of the Rochester Police Department and Monroe County Sheriff's Office,<br><br>                                      Defendants. | 21-cv-6718 (FPG)<br><br><br>**FIRST AMENDED COMPLAINT**<br>**[JURY TRIAL DEMANDED]** |

Plaintiff, by her attorneys, ROTH & ROTH, LLP and EASTON THOMPSON KASPAREK SHIFFRIN LLP, complaining of the defendants, respectfully allege as follows:

I.     **PARTIES**

1.     Plaintiff RACHEL BARNHART is a resident of the City of Rochester, State of New York, and a Monroe County Legislator, representing the 21st District in the City of Rochester.

2.     Defendant CITY OF ROCHESTER ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the RPD.

3.     Defendant CITY OF ROCHESTER ("CITY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant

CITY maintains the City of Rochester Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department. RPD acts as Defendant CITY's agent and Defendant CITY assumes the risks incidental to the maintenance of a police department and the employment of police officers.

4.      "JOHN DOE" ROCHESTER POLICE DEPARTMENT OFFICERS 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Police Officers with the RPD. At all relevant times, these defendants were acting within the scope of their employment with the CITY and RPD and under color of state law. They are sued in their individual capacities. John Doe RPD Officers are referred to collectively as "the RPD officers."

5.      Defendant COUNTY OF MONROE ("COUNTY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant COUNTY maintains the Monroe County Sheriff's Office ("MCSO") and pays the salaries of the Monroe County Sheriff and MCSO deputies. MCSO acts as Defendant COUNTY'S agent and Defendant COUNTY assumes the risks incidental to the maintenance of the MCSO as the COUNTY's police department.

6.      Defendant TODD BAXTER ("Sheriff Baxter" or "BAXTER") was, at all times relevant herein, the duly elected Sheriff of the County of Monroe. At all relevant times, Defendant BAXTER was acting within the scope of his employment and under color of state law. He is sued in his individual and official capacity.

7.      "RICHARD ROE" MONROE COUNTY SHERIFF'S DEPUTIES 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Deputy Sheriffs with the Monroe County Sheriff's Office ("MCSO"). At all relevant

times, these defendants were acting within the scope of their employment with the County and under Sheriff BAXTER and acting under color of state law. They are sued in their individual capacities. They are referred to collectively as "the Sheriff's Deputies." BAXTER is responsible for the training, supervision and discipline of the Defendant Sheriff's Deputies under state law.

## II.  JURISDICTION and VENUE

8.      This Court has federal-question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over claims arising out of violations of the United States Constitution and 42 U.S.C. §§ 1983 and 1985.

9.      The Court has pendent jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. §1367.

10.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Western District of New York, the judicial district where the claims arose and in which the Defendants conduct business.

11.     Ms. BARNHART filed timely Notices of Claim against the City and County, in compliance with the Municipal Law § 50.

12.     The CITY and the COUNTY waived 50-h hearings for Ms. BARNHART.

13.     More than thirty (30) days have elapsed since service of said Notices of Claim were filed and the City and County have failed to pay or adjust the claim.

14.     This action was being brought within a year of the event that gives rise to Ms. BARNHART's causes of action under New York State law and Plaintiffs have complied with all of the statutory prerequisites for bringing this action.

## IV.  STATEMENT OF FACTS

### A.  Facts Common to All Causes of Action.

15.     On March 23, 2020, Daniel Prude's family sought help from the Rochester Police Department ("RPD") as Daniel was suffering an acute mental health crisis. Tragically, that call for help ended with Daniel naked and handcuffed with his face covered by a "spit hood," as an RPD officer pushed his head into the freezing asphalt for several minutes. RPD officers on the scene mocked Daniel and chatted with each other while he asphyxiated. Daniel was declared brain dead that night; he was taken off life support and died on March 30.

16.     When the video of RPD Officers killing Daniel Prude was finally made public on September 2, 2020, it sparked nationwide outrage. In Rochester, thousands of people gathered to mourn the loss of Black lives, demand the CITY finally end its racist and brutal policing practices, and call for new visions of public safety that value Black lives.

17.     On September 2-6, 2020, the RPD and MCSO defendants responded to peaceful protests with extreme violence—including the indiscriminate use of tear gas and pepper spray, 40 millimeter blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other supposedly "less-than-lethal" munitions.

18.     Local elected officials, including Plaintiff RACHEL BARNHART, were horrified and called on the Defendants to stop using extreme and excessive force to suppress the rights of protesters to peacefully assemble to mourn the loss of Black lives, demand the CITY finally end its racist and brutal policing practices, and call for new visions of public safety that value Black lives.

19.     On September 5, 2020, Ms. BARNHART and several other local elected officials marched with protesters from Martin Luther King Park towards the Public Safety Building.

20.     Police escorted protesters as they marched on the City's streets, until they approached the intersection of Broad Street and Exchange Boulevard.

21.     Defendants had closed the intersection of Broad Street and Exchange Boulevard to vehicular and pedestrian traffic prior to Plaintiff and other protesters approaching that intersection.

22.     When Plaintiff and other protesters approached the intersection of Broad Street and Exchange Boulevard, they were met with an overwhelming presence of RPD officers, Sheriff's deputies and State Police in full riot gear with military grade weapons—including a bearcat tank—and police dogs.

23.     Ms. BARNHART and the other protesters were stopped at the intersection of Broad Street and Exchange Blvd. by Defendants, who prohibited their freedom of movement at the intersection.

24.     Ms. BARNHART and other local elected officials placed themselves at the front line of protesters, believing that the RPD, Sheriff's Deputies and other law enforcement would refrain from using the same level of extreme violence against protesters if they saw local elected officials front and center.

25.     Ms. Barnhart was wrong.

26.     Instead, RPD Officers and/or Sheriff's Deputies targeted and shot Ms. BARNHART in the head and chest with pepper balls from approximately 15-20 feet.



27.     Upon information and belief, Ms. BARNHART was targeted and shot in the head and chest by a John Doe RPD Officer and/or Richard Roe Sheriff's Deputy in retaliation for exercising her First Amendment rights.

28.     Upon information and belief, Ms. BARNHART was targeted and shot in the head and chest by a John Doe RPD Officer and/or Richard Roe Sheriff's Deputy because she was an elected official.

29.     Upon information and belief, Ms. BARNHART was targeted and shot in the head and chest by a John Doe RPD Officer and/or Richard Roe Sheriff's Deputy because of the message she and other protesters were expressing: to demand the City finally end its racist and brutal policing practices and call for new visions of public safety that values Black lives.

30.     Just before she was shot, Ms. BARNHART had been video recording the law enforcement officers.

31.     Upon information and belief, Ms. BARNHART was targeted and shot in the head by a John Doe RPD Officer and/or Richard Roe Sheriff's Deputy in retaliation for video recording the law enforcement officers performing their duties in a public place.

32.     Because of the close proximity, it is clear that the RPD Officers and/or Sheriff's Deputies intended to shoot Ms. BARNHART in the head and chest.

33.     It is a violation of RPD policy to shoot any person in the face, head or upper body with pepper balls, "unless justified."

34.     Ms. BARNHART was not committing a crime or violation, let alone threatening law enforcement in any way, when she was shot in the head and chest by a RPD Officers and/or Sheriff's Deputies.

35. The RPD Officers and/or Sheriff's Deputies lacked cause or any legal justification for shooting Ms. BARNHART in the head and chest with pepper balls.

36. Additionally, as videos of the law enforcement response on that night demonstrate, the RPD Officers and/or Sheriff's Deputies, along with other law enforcement officers, unleashed a torrent of violence on the peaceful protesters—causing many protesters serious injury. One such video, incorporated herein, can be seen here:

https://tinyurl.com/vra3x4j7.

37. Pursuant to policy, Defendants attacked Plaintiff with tear gas and other chemical weapons, with the Long Range Acoustic Device ("LRAD") and flash bang grenades.

38. At no time did Ms. BARNHART commit a crime or any act that justified the use of any force against her.

39. As a result of being shot in the head with a pepper ball by RPD Officers and/or Sheriff's Deputies, Ms. BARNHART sustained a concussion, as well as irritation to her skin, eyes, mouth, nose, and lungs.

40. As a result of the chemical weapons, LRAD, flash bang grenades, and other force used against her, Plaintiff suffered serious physical and emotional injuries and other damages.

B. **Unlawful Municipal Policies and Negligence of the City And RPD in Failing to Properly Train RPD Officers On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Officers Who Used Excessive Force Against Protesters**.

41. For months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the CITY and RPD anticipated and planned for large-scale protests when the video was eventually released.

42. From the very beginning, the City and RPD officials zeroed in on the fact that, unlike other protests, these were focused directly on police misconduct and racism. City and

RPD officials at the highest levels subscribed to the theory that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence.

43.     This manifested in the training of their officers, both before and since, that nonviolent protestors will stand in front to shield violent protestors who throw objects from behind them, and that not everyone standing with their hands up is peaceful. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

44.     During those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD developed a protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing.

45.     The violations of Ms. BARNHART'S rights are attributable to the CITY and RPD's disregard of many years of notice, criticism, and other relevant data points, both internal and external, related to its unconstitutional policing of similar peaceful protests and peaceful demonstrations.

46.     Since at least the 2009, the RPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, including peaceful protests and lawful demonstrations.

47.     Upon information and belief, the core training provided by the CITY related to protest response is based on crowd management and disorder control tactics for policing large-scale civil disorders and riots.

48.     According to the CITY's website, the RPD's Mobile Field Force (MFF) is a "specially trained and equipped team providing a rapid, organized and disciplined response to civil disorder [and] crowd control."

49.     The MFF was the RPD's primary unit tasked with policing the peaceful protests in the wake of George Floyd and Daniel Prude in May and September 2020, respectively, and on the night of September 4-5, 2020 specifically.

50.     Upon information and belief, the MFF's training and guidelines treat peaceful protests and peaceful demonstrations as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, such as disorder control formations and mass use of chemical weapons.

51.     Such disperse and demoralize tactics have persisted through the present as exemplified by the experiences of Ms. BARNHART.

52.     Upon information and belief, the MFF's "civil disorder" training and guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations—only for large-scale civil disorders such as riots.

53.     However, neither the MFF's "civil disorder" training and guidelines, nor, upon information and belief, any related RPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

54.     For example, upon information and belief, there is virtually no RPD training—and certainly no meaningful RPD training—focusing on how to utilize the tactics described in the MFF's "civil disorder" training and guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

55.     Many MFF members have histories of engaging in the kinds of misconduct complained of herein, among other places, by CRB complaints, PSS investigations and in lawsuits.

56.     Examples of the RPD's unreasonable and discriminatory use of force at prior lawful protests include:

- In October 2009, an anti-war protest in Rochester resulted in several physical confrontations, with two protesters receiving stitches at the hospital after RPD officers pushed them face-first to the ground, and 12 protesters arrested for exercising their First Amendment rights. The peaceful march, held in the early evening, was interrupted by approximately forty RPD vehicles. Within three minutes of giving the order to disperse, RPD officers began to shove and hit protesters with clubs and deploy pepper spray. Protesters described RPD officers wading through the crowd to pick out Black students to arrest. A press videographer who was filming one such arrest was wrestled to the ground by police and himself arrested.

- In May 2015, Katrina Perkins was protesting police brutality on a public street in a residential neighborhood, where two of her daughters and six of her grandchildren reside. Though Ms. Perkins was peacefully demonstrating, RPD officers violently

seized and arrested her and then charged her with disorderly conduct and disruption. Those charges were dismissed two months later. Police brutality is a deeply personal issue to Ms. Perkins, as her daughter Lashedica was the 13-year-old shot three times by former-Deputy Chief Simmons in 2005.

- In July 2016, in Rochester as across the nation, people took to the streets to uphold the sanctity of Black lives and call for an end to racist policing. In response, the RPD deployed, beat, shoved, and pepper sprayed protesters. As one described it: "I started to turn and they tackled me to the ground.…They're beating citizens for no reason whatsoever. I wasn't doing anything. I was taking pictures." RPD officers, in keeping with their pattern and practice, particularly targeted Black protesters with unlawful force, including Black journalists: Carlet Cleare and Justin Carter of WHAM-TV were both handcuffed and detained, even though Ms. Cleare was wearing a WHAM-TV shirt and they identified themselves as members of the press. Over the course of one weekend, Rochester had more arrests at its BLM protest (74) than the rest of the nation combined.

57. Despite the wealth of evidence of RPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in RPD training as it relates to constitutionally compliant protest policing.

58. In fact, following the 2016 protest, the RPD and Mayor Lovely Warren's office stated the police handled themselves appropriately.

59.     When questioned by public officials after the September 2020 protests, former RPD Chief La'Ron Singletary stated that he did not review the RPD's actions at the 2016 protest in developing the RPD's strategy for responding to protests in 2020.

60.     The City and RPD's failure to train and improper training led to widespread excessive force at the 2020 protests, as demonstrated by RPD officers body worn camera videos, media reports, and RPD subject resistance reports.  However, Based on statements by City Officials and RPD command staff to date, and publicly available information, no RPD officer has reported any fellow officer for their unlawful use of force and no RPD officers have been disciplined for their unlawful use of force on September 2, 3, 4 or 5, 2020.

61.     The City and RPD did not simply ratify excessive force through the lack of reporting and discipline. It approved the force during the demonstrations because its policies authorized these excessive levels of force. RPD training on grenadier, MFF, and crowd control tactics, as well as its subject resistance reports, show that tear gas, pepper spray, projectiles, and grenades were supplied by superiors and deployed on their orders pursuant to RPD policies on use for force. There appears to have been no consideration given to whether such force would be excessive to secure compliance with traffic laws or enforce violations or misdemeanors against nonviolent protestors.

62.     In summary, upon information and belief, the RPD's exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that RPD policing of protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates the City's negligence in failing to train and supervise RPD Officers in properly and

lawfully policing protests to ensure that protesters' rights under the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights are not violated. As a result of the City's negligence, Plaintiff was injured and harmed, as described herein.

      C.   **Unlawful Municipal Policies and Negligence of the COUNTY and Sheriff BAXTER in Failing to Properly Train Sheriff's Deputies On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Sheriff's Deputies Who Used Excessive Force Against Protesters**.

63.    Upon information and belief, for months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the COUNTY and BAXTER coordinated with the CITY and RPD to prepare for and plan their coordinated response to the anticipated large-scale protests when the video was eventually released.

64.    From the very beginning, the BAXTER and other COUNTY officials zeroed in on the fact that, unlike other protests, these were focused directly on police misconduct and racism. Like the City and RPD officials, BAXTER and other COUNTY officials at the highest levels subscribed to the theory that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence.

65.    This manifested in the training of their Sheriff's Deputies, both before and since, that nonviolent protestors will stand in front to shield violent protestors who throw objects from behind them, and that not everyone standing with their hands up is peaceful. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their Sheriff's Deputies was clear: there is no such thing as a peaceful protestor.

66.    Upon information and belief, during those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD coordinated with the COUNTY and BAXTER to develop a coordinated protest response plan that included responding to peaceful protests with

extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing

67. Prior to September 2020, the COUNTY and BAXTER had received clear notice that peaceful protests and lawful demonstrations have occurred and will continue to occur in Monroe County, and that without proper training, his Deputy Sheriffs would violate individuals' constitutional rights and endanger the life and safety of protesters, such as Plaintiff.

68. The COUNTY and BAXTER deliberately disregarded the fact that peaceful protests and peaceful demonstrations have occurred and will continue to occur in Monroe County, and instead has trained his Deputies that such lawful First Amendment activities constitute "civil disturbances" that mut be policed in the same manner as "violent mobs" or "riots."

69. The COUNTY and BAXTER, upon information and belief, took no steps to train Sheriff's Deputies on lawfully policing protests and other First Amendment activities.

70. Instead, the COUNTY and BAXTER, pursuant to the County's Hazard Mitigation Plan, trained Sheriff's Deputies that a "civil disturbance" is defined as both "peaceful demonstrations or acts of violence."

71. Upon information and belief, the Hazard Mitigation Plan was in full force and effect at all times relevant herein.

72. Upon information and belief, prior to 2020 and at all times relevant herein, the COUNTY and BAXTER had implemented the Hazard Mitigation Plan, and trained Sheriff's

Deputies in accordance with its mandates. Thus, the COUNTY and BAXTER explicitly conflate peaceful protests and peaceful demonstration with violent riots.

73.     Upon information and belief, the COUNTY and BAXTER did not provide any training to Sheriff's Deputies on drawing a meaningful distinction between "peaceful demonstrations" and "violent mobs". For example, in its "Hazard Mitigation Plan," the County states that, "Many civil unrest incidents are spontaneous and can occur at any time, rendering prediction of probability of future occurrences difficult. When these incidents occur, they can become extremely disruptive and difficult to control. Assumedly, civil unrest incidents including marches, protests, demonstrations, and gatherings will continue to occur throughout Monroe County."

74.     According to the Hazard Mitigation Plan, peaceful protests and demonstrations are discouraged because of the perceived negative impacts on property resources, real estate and the economy; again, this is a result of the COUNTY and BAXTER falsely conflating "peaceful demonstrations" and peaceful protests with "acts of violence."

75.     Upon information and belief, the COUNTY and BAXTER do not provide any training to Sheriff's Deputies on how to encourage and support individuals engaging in "peaceful demonstrations" to ensure that their constitutional rights are not violated by law enforcement officers.

76.     Upon information and belief, the COUNTY and BAXTER do not provide any training to Sheriff's Deputies on making a meaningful distinction between how Sheriff's Deputies are trained and instructed on policing "peaceful demonstrations", "peaceful protests" versus "violent mobs" and riots.

77. Instead, the Hazard Mitigation Plan states that, "[m]any protests intended to be peaceful demonstrations to the public and the government can escalate into general chaos." Thus, upon information and belief, the COUNTY and BAXTER train Sheriff's Deputies to police peaceful demonstrations in the same manner as they would a violent mob.

78. Like the RPD, upon information and belief, BAXTER trains Sheriff's Deputies exclusively on deterring, dispersing, and demoralizing protests and peaceful demonstrations.

79. In June 2020, several Monroe County Legislators called on BAXTER to implement new protest training to ensure the safety of protesters at Black Lives Matter demonstrations. The legislators drafted a letter to County Executive Adam Bello and BAXTER in which they made a number of requests related to public safety and the safety of protesters, and closed by stating, "Once again, we believe the safety of both protesters, motorists, and law enforcement is of the utmost importance. Right here in Monroe County and across the Nation, we have seen the negative results when leaders are reactionary rather than proactive. Please be sure that a plan is in place to ensure the mutual safety of all involved."

80. BAXTER claimed the letter was a "political stunt" and refused to provide any specific details regarding how Sheriff's Deputies would ensure the safety of protesters during peaceful demonstrations

81. As a result of the COUNTY's unlawful policies, practices and customs, and BAXTER's negligence, Plaintiff was injured and harmed, as described herein.

## IV.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Excessive Force**
***Pursuant to 42 U.S.C. § 1983***

82. All preceding and subsequent paragraphs are incorporated by reference.

83.     Defendants' actions towards Plaintiff constitutes excessive force in violation of 4th Amendment of the United States Constitution and 42 U.S.C. § 1983.

84.     Defendants used force against Ms. BARNHART that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted them

85.     It was objectively unreasonable for the John Doe RPD Officers and/or Richard Roe Sheriffs Deputies to shoot Ms. BARNHART in the head and chest with pepper balls.

86.     It was objectively unreasonable for Defendants to attack Ms. BARNHART with tear gas and other chemical weapons, and the LRAD flash bang grenades, and other "less lethal" weapons.

87.     The types and levels of force Defendants used against Ms. BARNHART were in contravention of, or inconsistent with, related RPD policies and/or training.

88.     As a result of the acts and omissions of the RPD officers and/or Sheriff's Deputies, Defendants deprived Ms. BARNHART of her federal, state, and/or other legal rights; caused Ms. BARNHART bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Ms. BARNHART to expend costs and expenses; and/or otherwise damaged and injured Ms. BARNHART.

89.     The actions of the RPD officers and Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

90.     As a result of the foregoing, Plaintiff suffered injuries and damages.

## SECOND CLAIM FOR RELIEF
### Assault and Battery
#### *Pursuant to New York State Law*

91.     All preceding and subsequent paragraphs are incorporated by reference.

92.     RPD officers and/or Sheriff's Deputies battered Ms. BARNHART by subjecting her to various chemical weapons.

93.     RPD officers and/or Sheriff's Deputies shot Ms. BARNHART in the head and chest with pepper balls.

94.     RPD officers and/or Sheriff's Deputies attacked Ms. BARNHART with tear gas and other chemical weapons, the LRAD flash bang grenades, and other "less lethal" weapons.

95.     Ms. BARNHART was not threatening the law enforcement officers or any other person at any time.

96.     By the aforedescribed conduct, defendants, their agents, servants and employees, acting within the scope of their employment, intentionally, willfully and maliciously battered Plaintiff Ms. BARNHART, when they, in a hostile and/or offensive manner struck Plaintiff without her consent and with the intention of causing harmful and/or offensive bodily contact to the Plaintiff and caused such battery.

97.     The RPD Officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant CITY and the RPD, which are therefore responsible for their conduct.

98.     The Defendant CITY, as the employer of the individual RPD defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

99.     At no point during the incidents described herein did the circumstances necessitate or support the above applications of force utilized by the defendant RPD officers and/or Sheriff's Deputies against Plaintiff.

100.     The actions of the RPD officers and Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

101.    As a result of the foregoing, Plaintiff suffered injuries and damages.

**THIRD CLAIM FOR RELIEF**
**First Amendment Infringements, Including First Amendment Retaliation**
*Pursuant to 42 U.S.C. § 1983*

102.    All preceding and subsequent paragraphs are incorporated by reference.

103.    In committing the acts and omissions complained of herein, Defendants acted under color of state law—individually, in concert, and through a conspiracy—to deprive Plaintiff of the rights protected by the First Amendment to the United States Constitution.

104.    Defendants (a) retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in falsely arresting Plaintiff, in subjecting Plaintiff to excessive force, in selectively enforcing laws and regulations against Plaintiff, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

105.    Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiff's perceived protected speech and/or conduct.

106.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

107.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

108.    As a result of the foregoing, Plaintiff suffered injuries and damages.

109.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTH CLAIM FOR RELIEF
### Failure To Intervene
### *Pursuant to 42 U.S.C. § 1983*

110.    All preceding and subsequent paragraphs are incorporated by reference.

111.    The individual defendants all had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of her constitutional rights by the other Defendant RPD officers and/or Sheriff's Deputies.

112.    The individual defendants failed to intervene on Plaintiff's behalf despite having had realistic opportunities to do so.

113.    The individual defendants failed to intervene on Plaintiff's behalf despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

114.    As a result of the aforementioned conduct of the individual defendants, Plaintiff's constitutional rights were violated.

115.    As a result, Plaintiff was damaged, injured and harmed, and seeks compensation in an amount to be determined at trial.

116.    Defendant RPD officers and/or Sheriff's Deputies' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

## FIFTH CLAIM FOR RELIEF
### Negligent Training, Supervision and Discipline
### (Against BAXTER)

117.    All preceding and subsequent paragraphs are incorporated by reference.

118.    Defendant BAXTER was negligent in the training, supervision and discipline of the Defendant Sheriff's Deputies, who were provided, upon information and belief, no training

for policing protests, engaging in peaceful crowd control, or how to properly and safely use the "less lethal" weapons.

119.     Alternatively, the training BAXTER provided to the Sheriff's Deputies was inadequate.

120.     Moreover, despite their use of extreme and excessive violence against protesters on September 2-6, 2020, BAXTER was negligent in failing to supervise or discipline any of his Sheriff's Deputies related to any force used protesters on those nights prior to Plaintiff's injury. BAXTER's negligence was the direct and proximate cause of Plaintiff's injuries.

121.     BAXTER's negligence in failing to supervise and discipline his Sheriff's Deputies was the direct and proximate cause of Plaintiff's injuries.

122.     As a result of the foregoing, Plaintiff suffered injuries and damages.

### SIXTH CLAIM FOR RELIEF
**Negligent Planning of the Protest Response**
**(Against BAXTER)**

123.     All preceding and subsequent paragraphs are incorporated by reference.

124.     Defendant BAXTER was negligent in planning the response of his Sheriff's Deputies to the protests.

125.      BAXTER had a special duty to ensure that the rights of Plaintiff and other protesters to free speech, expression and to assemble under the First Amendment to the United States Constitution, and Article I, section 8 of the New York State Constitution, were not violated, and that protesters were not assaulted, battered, subjected to excessive force and/or falsely arrested by law enforcement.

126.     BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies that Black Lives

Matter protests are led by a nationwide conspiracy of outside agitators bent on violence; this manifested in the training of Sheriff's Deputies that what seem to be peaceful demonstrators are a shield deliberately sent to the front lines to screen the throwing of objects from the rear. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

127.     BAXTER breached his duty to Plaintiff and other protesters by implementing a protest response plan that violated the rights to free speech, expression and to assemble.

128.     BAXTER breached his duty to Plaintiff and other protesters by implementing a protest response plan that conflated peaceful protests and demonstrations with violent mobs and riots; thus, BAXTER knew or should have known that in the absence of a proper protest response plan, his Sheriff's Deputies would use unreasonable and excessive force against peaceful demonstrators, like Plaintiff.

129.     BAXTER breached his duty to Plaintiff and other protesters by implementing a protest response plan that instructed his Sheriff's Deputies to use chemical weapons against protesters; however, based on national news reports in the months before the September protests, BAXTER knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects, including menstrual irregularities.

130.     BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to police peaceful demonstrations in the same manner as they would police violent mobs.

131.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to use chemical weapons indiscriminately against protesters.

132.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to that they could shoot pepper balls and other "less-than-lethal" projectiles at protesters' heads.

133.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

134.    Plaintiff's injuries were a direct and proximate result BAXTER negligently planning the response to the protests.

135.    As a result of the foregoing, Plaintiff suffered injuries and damages.

**SEVENTH CLAIM FOR RELIEF**
**Negligent Training, Supervision and Discipline**
**(Against the CITY)**

136.    All preceding and subsequent paragraphs are incorporated by reference.

137.    The CITY and RPD were negligent in the training, supervision and discipline of the RPD officers, who were provided, upon information and belief, no training for policing protests, engaging in peaceful crowd control, or how to properly and safely use the "less lethal" weapons.

138.    Alternatively, the training the CITY provided to the RPD officers was inadequate.

139.     Moreover, despite their use of extreme and excessive violence against protesters on September 2-6, 2020, the CITY was negligent in failing to supervise or discipline any of the RPD officers related to any force used protesters on those nights prior to Plaintiff's injury. The City's negligence was the direct and proximate cause of Plaintiff's injuries.

140.     As a result of the foregoing, Plaintiff suffered injuries and damages.

### EIGHTH CLAIM FOR RELIEF
**Negligent Planning of the Protest Response**
**(Against the CITY)**

141.     All preceding and subsequent paragraphs are incorporated by reference.

142.     The CITY and RPD were negligent in planning the response to the protests.

143.     The CITY had a special duty to ensure that the rights of Plaintiff and other protesters to free speech, expression and to assemble under Article I, section 8 of the New York State Constitution were not violated, and that protesters were not assaulted, battered, subjected to excessive force and/or falsely arrested by law enforcement.

144.     For months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the CITY and RPD anticipated and planned for large-scale protests when the video was eventually released. During those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD developed a protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing.

145.     The CITY and RPD breached its duty to Plaintiff and other protesters by failing to implement any plan whatsoever for how to ensure that RPD officers protected and promoted protesters rights to free speech, expression and to assemble under Article I, section 8 of the New York State Constitution, and the New York Right to Monitor Act.

146.     The City and RPD breached its duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed RPD officers that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence; this manifested in the training of RPD officers that what seem to be peaceful demonstrators are a shield deliberately sent to the front lines to screen the throwing of objects from the rear. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

147.     The CITY and RPD breached its duty to Plaintiff and other protesters by implementing a protest response plan that affirmatively violated protesters' rights to free speech, expression and to assemble under First Amendment of the United States Constitution and Article I, section 8 of the New York State Constitution, and the New York Right to Monitor Act.

148.     The CITY and RPD breached its duty to Plaintiff and other protesters by implementing a protest response plan that instructed its officers to use extreme violence, militarized police tactics, military-grade weapons, and chemical weapons against protesters.

149.   The CITY knew or should have known that its protest plan was unlawful and that implementation of its plan would cause protesters rights to free speech, expression and to assemble under the First Amendment of the United States Constitution and Article I, section 8 of

the New York State Constitution to be violated; and that RPD officers and other law enforcement officers would cause serious injuries to protesters.

150.   The CITY and RPD knew that at past protests, numerous RPD officers had seriously injured peaceful demonstrators; and that in the absence of a proper protest response plan, RPD officers would use unreasonable and excessive force against peaceful demonstrators and falsely arrest them.

151.   The CITY knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects—as same had been widely reported around the county in the months prior to the RPD's use of said chemical weapons in September 2020.

152.   The CITY breached his duty to keep demonstrators safe by, among other things, failing to implement a lawful protest response plan, and instead training RPD officers to police peaceful demonstrations in the same manner as they would police violent mobs or riots.

153.   The CITY breached its duty to keep demonstrators safe by implementing a protest response plan which, among other things, instructed RPD officers to use chemical weapons against protesters in the absence of individualized probable cause – despite knowing of the serious adverse health effects such chemical weapons would cause.

154.   The CITY breached its duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed RPD officers to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

155.    The CITY breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that failed to properly instruct RPD officers on their duty to intervene to prevent the violation of protesters rights by other RPD officers, Sheriff's Deputies, and/or other law enforcement officials.

156.    The CITY breached his duty to keep demonstrators safe by implementing a protest response plan that caused the violation of Plaintiff's rights in all other ways detailed herein.

157.    Plaintiff's injuries were a direct and proximate result of the CITY's implementation of its negligent a protest response plan.

158.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## NINTH CLAIM FOR RELIEF
### Negligence
### (Against the Individual Defendants)

159.    All preceding and subsequent paragraphs are incorporated by reference.

160.    The Defendant RPD officers and Sheriff's Deputies, their agents, servants, employees, officers and deputies were negligent using the "less lethal" military grade weapons and chemical weapons against Plaintiff, which was the direct and proximate cause of Plaintiff's injuries.

161.    The Defendant RPD officers and Sheriff's Deputies had a duty to permit the protesters to engage in First Amendment Activities and to protect them from harm or physical violence.

162.    The Defendant RPD officers and Sheriff's Deputies had a duty to not use force against any individual protester in the absence of individualized cause or legal justification for the use of force.

163.    The Defendant RPD officers and Sheriff's Deputies breached that duty by firing "less lethal" munitions and chemical weapons into "groups" of protesters based on perceived "group conduct," without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

164.    The breach of that duty by the Defendant RPD officers and Sheriff's Deputies was the direct and proximately cause of Ms. BARNHART's serious injuries described herein.

165.    Defendant RPD officers and/or Sheriff's Deputies' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

166.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## TENTH CLAIM FOR RELIEF:
### Municipal Liability
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's First, Fourth and Fourteenth Amendment Rights—Related to the RPD's Response to the Daniel Prude Protests***
**(Against the City)**

167.    All preceding and subsequent paragraphs are incorporated by reference.

168.    All of the wrongful acts or omissions complained of herein against Plaintiff and other protesters were carried out by the individually named and unnamed RPD officers pursuant to: (a) formal policies, rules, and procedures of Defendant CITY; (b) actions and decisions by Defendant CITY's policymaking agents; (c) customs, practices, and usage of the RPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by CITY policymaking officials; (d) Defendant CITY's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the CITY's failures, and the failures of the other policymaking agents, to train, supervise, and discipline RPD officers, despite

full knowledge of the their wrongful acts against Plaintiff and other protesters, as described herein.

169.     As a result of the foregoing, Plaintiff suffered injuries and damages.

## ELEVENTH CLAIM FOR RELIEF
### Municipal Liability
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' First, Fourth and Fourteenth Amendment Rights During the Summer and Fall 2020 Racial Justice Protests*
### (Against the COUNTY and BAXTER)

170.     All preceding and subsequent paragraphs are incorporated by reference.

171.     All of the wrongful acts or omissions complained of herein against Plaintiff and other protesters were carried out by the individually named and unnamed MCSO employees and/or Sheriff's Deputies pursuant to: (a) formal policies, rules, and procedures of Defendants COUNTY and BAXTER; (b) actions and decisions by policymaking agents of the COUNTY and MCSO, including, but not limited to, Defendant BAXTER; (c) customs, practices, and usage of the MCSO that are so widespread and pervasive as to constitute de facto policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendants COUNTY, MCSO and BAXTER, and other policymaking officials; (d) Defendant COUNTY, MCSO and BAXTER's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by their failures, and the failures of the other policymaking agents, to train, supervise, and discipline MCSO employees and/or Sheriff's Deputies, despite full knowledge of their wrongful acts Plaintiffs and other protesters, as described herein.

172.     As a result of the foregoing, Plaintiff suffered injuries and damages.

## TWELFTH CLAIM FOR RELIEF:
### Municipal Liability
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's First, Fourth and Fourteenth Amendment Rights—Related to the RPD's Policy, Practice and Custom of*

***Retaliating Against Individuals Who Are Lawfully Recording Them Perform Their Duties in
Public Places***
**(Against the City)**

173.    All preceding and subsequent paragraphs are incorporated by reference

174.    All of the wrongful acts or omissions complained of herein against Ms.
BARNHART were carried out by the individually named and unnamed RPD officers pursuant
to: (a) formal policies, rules, and procedures of Defendant CITY; (b) actions and decisions by
Defendant CITY's policymaking agents; (c) customs, practices, and usage of the RPD that are so
widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned,
ratified, sanctioned, and/or enforced by CITY policymaking officials; (d) Defendant CITY's
deliberate indifference to Plaintiff's rights secured by the First, Fourth, and Fourteenth
Amendments of the United States Constitution, as evidenced by the CITY's failures, and the
failures of the other policymaking agents, to train, supervise, and discipline RPD officers, despite
full knowledge of the their wrongful acts against Plaintiff, as described herein.

175.    The City and RPD maintain an unlawful policy, practice and/or custom of RPD
officers retaliating against individuals who are lawfully video recording them perform their
duties in a public place.

176.    The City and RPD maintain an interrelated unlawful policy, practice and custom
of RPD officers making retaliator arrests and using force against individuals in the absence of the
commission of any crime by the person who was subjected to the unlawful arrest and/or use of
force, motivated by a desire to punish the person for the their perceived failure to display the
degree of deference or subservience demanded by the arresting officers.

177.    Such arrests and uses of force are frequently referred to as **"contempt of cop"**
arrests and uses of force.

178.     In order to conceal the illegality of these arrests and/or uses of force, the victim of the unlawful arrest is charged with a **"cover charge"**, usually a low-level crime which does not require a complaint, and whose elements can be established, for the purposes of a criminal complaint, by the officer's own perjured affidavit or testimony.

179.     RPD officers have a pattern and practice of charging one or more offenses as their favored cover charges: disorderly conduct, resisting arrest, or obstruction of governmental administration.

180.     The unlawful policy of retaliating against individuals who are lawfully video recording the RPD performing their duties in a public place can be inferred from the following incidents:

    a.   Emily Good was a victim of one such "contempt of cop" arrest on May 12, 2011. Ms. Good was standing on the front lawn of her home filming—from 10 to 15 feet away—RPD officers engaged in the traffic stop of a young Black man. RPD Officer Mario Masic noticed Ms. Good filming and ordered her back into her home, stating she seemed "anti-police" and he did not feel safe with her there. Ms. Good remained calm and stated she was only standing on her property and did not pose any threat. Masic responded that he'd had enough: "You know what? You're going to go to jail." He then trespassed onto Ms. Good's property, unlawfully seized and handcuffed her, and forcibly led her to a squad car while she pleaded for him to explain why she was being arrested. A video of the unlawful arrest, incorporated by reference herein, can be found here: https://tinyurl.com/yff34jaw. Ms. Good was charged with "obstructing governmental administration" but the charges were later dropped.

Though RPD's internal view concluded Masic should not have arrested Ms. Good for recording the traffic stop, then-Police Chief James Sheppard praised Masic for maintaining his "professional demeanor" in effecting the illegal arrest.

b.  On December 16, 2015, RPD Officer William Baker assaulted, battered and falsely arrested Shelise Colon in retaliation for her video recording Baker and RPD Officer Jason Kelly after they had stopped her boyfriend, Lawrence Barrett, on the sidewalk for no reason and pointed a TASER at him. The City settled the civil lawsuit brought by Colon and Barrett for $35,000.

c.  In July 2016, RPD officers targeted and assaulted, battered and arrested two black journalists at a Black Lives Matter protest in downtown Rochester. Carlet Cleare and Justin Carter of WHAM-TV were both handcuffed and detained by police, even though Ms. Cleare was wearing a WHAM-TV shirt and they identified themselves as members of the press. Press colleagues who were there described RPD ignoring white reporters standing right next to Ms. Cleare and Mr. Carter and instead targeting the two Black journalists.

d.  On May 27, 2018, at approximately 1:30 a.m., RPD Officer Michael Stephens assaulted, battered and falsely arrested Anthony Hall and Shamell Killings when they were lawfully recording him assault and batter their friend Craig Puritt on a public sidewalk on Monroe Avenue in the vicinity of Meigs Street. The City settled the civil lawsuit brought by Hall, Killings and Puritt for $175,000.

e.  On December 18, 2019, RPD Officers Dakota Vanbrederode and Ethan
Paszko assaulted, battered and falsely arrested Dynasty Buggs in retaliation
for her attempting to film them during a traffic stop. After Ms. Buggs pulled
over, Vanbrederode approached the driver's side and ordered Ms. Buggs to
exit the car without lawful justification. When Buggs objected and tried to
record what was happening on her phone, Vanbrederode grabbed her phone
and threw it. He then pepper sprayed her in the face while she was still in the
car. After, Vanbrederode forcibly removed Ms. Buggs from the car, placed
handcuffs on her wrists, and pepper sprayed her again after she was
handcuffed. Vanbrederode falsely charged Ms. Buggs with obstruction of
governmental administration; all charges were dropped at her first court
appearance.

f.  In June 2020, Tobias Massey was falsely arrested, assaulted and battered in
retaliation for recording RPD officers violently arresting a man in his front
yard. Mr. Massey was woken up at night by the sound of screaming from his
front yard, where three RPD officers were on top of a Black man, who was
crying that he could not breathe and did not want to die. Mr. Massey went
outside to record the event. When the RPD officers noticed he was recording,
they chased him into his home, wrestled him down, handcuffed and arrested
him. Mr. Massey was taken to the emergency room because of injuries he
sustained from the encounter, where the officers gave him an appearance
ticket charging him with resisting arrest and obstructing governmental

administration for filming the police. After reviewing the video, former Chief Singletary dropped the charges against Mr. Massey.

g.  Emily McIntyre was falsely arrested by RPD officer Stephen Boily and other RPD officers on August 2, 2020 at approximately 12:00 a.m. in the vicinity of East Avenue and Alexander Street in retaliation for filming an RPD officer who was arresting a Black man in front of a bar called Murphy's Law. The officers falsely charged her with a violation of the Mayor's unlawful curfew, even though she was not congregated with any other person, let alone five or more people as required to be arrested under the "curfew." All the false charges were dismissed in their entirety on January 19, 2021.

h.  At protests in the City of Rochester following the release of the video of RPD officers killing Daniel Prude, photojournalist Reynaldo DeGuzman was repeatedly targeted and shot with pepper balls and other chemical weapons in retaliation for video recording officers performing their duties in public. On September 3, 2020, RPD officers shot DeGuzman in the neck in retaliation for him filming RPD officers violently arrest another protester named Jamia McCuller. Thereafter, on September 4, 2020, while videorecording RPD officers respond to peaceful protesters on the Court Street Bridge, RPD officers repeatedly targeted him and shot his camera equipment, disabling his camera equipment and preventing him from filming and documenting the law enforcement response to the protests for the remainder of the night.

i.  Another woman named Devorah Chatman was also shot numerous times with pepper balls by RPD officers on September 3, 2020 in retaliation for attempting to video record RPD officers violently arrest Jamia McCuller.

j.  On September 3, 2020, RPD officers targeted and shot Democrat & Chronicle photographer Tina MacIntyre-Yee in the head as she was video recording officers respond to protesters in the vicinity of the Public Safety Building. The video of that incident, incorporated herein, is available at https://tinyurl.com/2hy52d5d.

k.  On December 18, 2020, Assemblyman Demond Meeks was assaulted, battered and falsely arrested in retaliation for filming RPD officers who were preparing to effectuate an eviction of a mother and her three children in the middle of the pandemic at 87 Glasgow Street, Rochester, New York, which is within the 137th Assembly District for which Assemblyman Meeks serves. Assemblyman Meeks was not interfering with the RPD officers in any way, physical or other-wise, but was seized, arrested, and falsely charged with violations of PL § 190.05. All the false charges were eventually dismissed on February 11, 2021.

l.  At the same December 18, 2020, INDIIA MARING was also falsely arrested in retaliation for filming officers who were preparing to effectuate an eviction of a mother and her three children in the middle of the pandemic at 87 Glasgow Street, Rochester, New York. Mx. MARING was not interfering with the RPD officers in any way, physical or other-wise, but was seized,

arrested, and falsely charged with violations of PL § 190.05. All the false

charges were eventually dismissed on February 11, 2021.

181.    Additionally, upon information and belief, there are numerous other cases that are

not listed that the City and RPD know about where RPD officers unlawfully retaliated against

people for lawfully filming them perform their official duties in public.

182.    Another quintessential example of a contempt-of-cop/cover charge false arrest is

detailed in another case settled by the City, *Redd* v. *City, et al.*, 15-CV-6049-DGL-JWF

(W.D.N.Y. 2014).

183.    In *Redd*, on November 27, 2013, RPD Officer Eliud Rodriguez arrested the 16-

year-old plaintiff and two of his the Edison Tech Varsity Basketball teammates[1] as they waited at

the bus stop in downtown Rochester, NY, which was designated by City of Rochester officials

and employees as the bus stop for all Rochester City School District sports teams. Officer

Rodriguez arrested Mr. Redd and his two teammates in retaliation for their failure to adequately

comply with his unlawful order to "move along" when the three student-athletes attempted to

explain they were waiting for their school bus. Officer Rodriguez and other RPD officers lied in

official police paperwork and charged Mr. Redd and his two teammates with Disorderly

Conduct, despite knowing they lacked probable cause to do so. Approximately ten (10) days

after the false arrest, the Monroe County District Attorney dropped all of the false criminal

charges levied against Mr. Redd and his two teammates.

184.    As detailed in the complaint in *Redd* v. *City, et al.*, in the summer of 2014, the

United States Department of Justice, including the Federal Bureau of Investigation (FBI) and the

---

[1] Mr. Redd received $30,000 to settle his claims with the City of Rochester, and his two co-arrestees / teammates, Weathers and Carelock, accepted settlements in the amount of $10,000 prior to filing civil rights lawsuits in court.

United States Attorneys' Office for the Western District of New York, conducted an investigation to determine whether federal criminal charges should be brought against RPD Officer Eliud Rodriguez for his unlawful conduct.

185.    Despite being aware of these cases, and paying at least hundreds of thousands of dollars to settle cases where RPD officers unlawfully retaliated against citizens for filming them perform their duties in public, the City and RPD apparently have not taken any actions to ensure that their officers are properly trained on the rights of people to film them perform their duties in public.

186.    Similarly, the City and RPD apparently have not taken any actions to ensure that RPD officers understand the law regarding probable cause to arrest an individual for the crimes of obstruction of governmental administration, disorderly conduct, harassment and other common "cover charges" that are frequently levied against individuals, in the absence of probable cause to believe they actually committed any crime.

187.    Upon information and belief, Defendant CITY and the RPD have refused calls for disclosure of statistics concerning minor offenses such as the "cover charge" crimes.

188.    Upon information and belief, the "contempt of cop" and "cover charge" charges levied most regularly by Rochester Police Officers are disorderly conduct, resisting arrest, obstruction of governmental administration, trespass and harassment.

189.    Upon information and belief, "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, obstruction of governmental administration, trespass and harassment are relatively easy for police to levy in the absence of actual probable cause because they may arise out of nearly any police-civilian interaction.

190.     Upon information and belief, Defendant CITY has been, and continues to be, aware of the prevalence of the problem of officers of the RPD retaliating against individuals for filming them, but has failed to take action to remedy the problem.

191.     Upon information and belief, to date the Defendant CITY has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by RPD Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, obstruction of governmental administration, trespass and harassment.

192.     Upon information and belief, to date the Defendant CITY has not implemented any particular or remedial training, oversight measures or policies designed or intended to curtail the longstanding and widespread practice of RPD officers of retaliating and using excessive force against against individuals for lawfully recording them perform their official duties in public places.

193.     The RPD officers were acting pursuant to the custom, practice, and/or policy of subjecting individuals retaliating against individuals for lawfully filming them when she was intentionally targeted and shot in the head and chest as she was filming them perform their duties in a public place on the night of September 5, 2020.

194.     The RPD's practice of tolerating and condoning its officers retaliate against individuals for lawfully video recording them performing their duties in public caused the RPD officers to unlawfully assault, batter and use excessive force against Ms. BARNHART.

195.     As a result of the foregoing, Plaintiff suffered injuries and damages.

<u>**THIRTEENTH CLAIM FOR RELIEF**</u>
**Violation of New York Right to Monitor Act**
**New York Civil Rights Law § 79-p**

196.     All preceding and subsequent paragraphs are incorporated by reference.

197.     Prior to being shot in the head and chest and otherwise assaulted, battered, and subjected to excessive force, Ms. BARNHART was exercising his rights under New York Civil Rights Law § 79-p, the New Yorker's Right to Monitor Act, to record law enforcement activity and to maintain custody and control over the recordings he had taken.

198.     Prior to being shot in the head and chest and otherwise assaulted, battered, and subjected to excessive force, Ms. BARNHART had not physically interfered with law enforcement activity or engaged in obstruction of governmental administration or other unlawful conduct.

199.     Defendants shot Ms. BARNHART  in the head and chest and otherwise assaulted, battered, and subjected her to excessive force, intentionally preventing her from further recording law enforcement activity.

200.     Defendants lacked reasonable or probable cause to stop, seize or arrest BARNHART for obstruction of governmental administration or any other crime; and lacked any justification shooting her in the head and chest and otherwise assaulting, battering, and subjecting her to excessive force.

201.     The RPD Officers were at all times agents, servants, and employees acting under color of law and within the scope of their employment by the Defendant CITY and the RPD, which are therefore responsible for their conduct.

202.     The Defendant CITY, as the employer of the individual RPD Officers, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

203.     Defendants actions were willful, malicious, oppressive, and/or reckless, and were of such a nature that punitive damages should be imposed.

204.   As a result of the foregoing, Plaintiff suffered injuries and damages.

WHEREFORE and in light of the foregoing, Plaintiff demands judgment on all claims for relief:

a.   Empanel a jury;

b.   Award compensatory and punitive damages;

c.   The Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

d.   Actual damages in an amount to be determined at trial against the City of Rochester and County of Monroe;

e.   Statutory attorney's fees, disbursements and costs of the action pursuant to, *inter alia*, 42 U.S.C. § 1988, New York Civil Rights Law § 79-P(3)(d), and New York common law;

f.   Such other and further relief as the court may deem just and proper.

Dated: New York, New York       Respectfully Submitted,
       January 6, 2021

                                ROTH & ROTH, LLP.
                                EASTON THOMPSON KASPEREK SHIFFRIN LLP

                                        ~//s//~
                                _____
                                Elliot Dolby Shields
                                Co-counsel for Plaintiffs
                                192 Lexington Avenue, Suite 802
                                New York, New York 10024
                                (212) 425-1020

                                Donald Thompson
                                Co-counsel for Plaintiffs
                                16 West Main Street, Suite 243
                                Rochester, New York 14614
                                Ph: (585) 423-8290